Sealed

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:11-CR-20321-PAS-1



United States of America,

      Plaintiff/Respondent

      v.

Luis Fernando Bertulucci Castillo,

      Defendant/Movant

SUPPLEMENTAL MOTION TO SEAL PROCEEDINGS
AND MOTION FOR SPECIFIC PERFORMANCE OF
PLEA AGREEMENT AND MEMORANDUM OF FACT
AND LAW IN SUPPORT

Movant, Luis Fernando Bertulucci Castillo, acting pro se, moves the court to seal this motion along with affidavits and copies of the exhibits. This motion contains sensitive information, and names contained within it, that should not be publicly available. Movant is aware of Southern District of Florida Rule 5.4 and is also aware of changes to the sealed documents rule. Unfortunately, due to his status as an inmate at Rivers Correctional Institution (in Winton, NC) and his lack of access to office supplies, movant is unable to comply with all of the specific requirements of the rule.

OTHER AUTHORITIES

Comes now, Luis Fernando Bertulucci Castillo, appearing personally pursuant to the Judiciary Act of 1789, Section 35, and hereby files this motion to seal proceedings and motion for specific performance of plea agreement and memorandum of law in support. The materials movant seeks to have sealed include matters of great significance to the interests of justice, matters that also have maintained and still have under death threat the defendant and his innocent family, including highly

1

confidential information that should remain under seal until the con-
clusion of the litigation, through the appeal, or the running the run-
ning time to appeal, at which point they should be destroyed. These
issues can certainly be entertained by this court. In order to provide
the deserved relief sought by the defendant, the Judiciary Act of 1789,
Section 32, states:

> And be it further enacted, that not summons, writ,
> declaration, return, process, judgment, or other
> proceedings in civil cases in any of the courts of
> the United States shall be abated, arrested, quashed,
> or otherwise reversed for any defect or want of form,
> but said courts shall proceed and give judgment ac-
> cording as the right of cause and matter of law shall
> appear unto them, without regarding imperfections,
> defects of want for such writ, declaration, or their
> pleadings, return, process of courts proceedings what-
> soever.

The Judiciary Act of 1789 has never been amended or appealed.

This motion is filed together with a completed and signed motion
to seal proffer of facts to be proven at hearing. Although movant can
not send this motion separately and in a specifically designated en-
velope, movant would ask the court to review his motion as well as his
affidavits, proffers, and communications, and if the court in its dis-
cretion determines that this motion and proceedings should be sealed,
then movant would ask the court to determine what length of time would
be appropriate for these matters to remain sealed. The information
provided in the aforementioned documents includes names that should
not be in public record, for reasons of personal safety, as well as
references to investigations that should not be public and allega-
tions about attorneys and their conduct.

Movant understands that proceedings in this court should gener-
ally be public and that, by default, court filings are a matter of
public record. Accordingly, your movant respectfully requests that

this motion and its proceedings be sealed. However, if the court in
its discretion determines that some or all of the information and
motions filed should be shielded from public view, then movant also
requests that the court seal such documents for a reasonable period of
time as determined by the court. In the event that the court denies
this motion to seal, movant waves his right according to legal pro-
cedures and local rules of the U.S. District Court for the Southern
District of Florida, including Rule 5.4(e), that the clerk return to
movant the materials which movant has sought to file under seal. By
waiving his right to legal procedures and local rules, your movant
will take the risk that represents to make public its litigations,
understanding that making public such allegations will exacerbate the
level of enragement of the enemies aroused as a direct consequence of
the U.S. government's outrageous actions against the defendant.

The defendant also understands that the risk that implies in
making public such allegations (in the event that this court in its
discretion denies to seal this motion) could be a huge price to pay
by defying such enemies. The defendant further understands that the
only possibility to obtain the deserved relief is addressing to the
court these unpleasant but real aberrant and disgraceful government
actions against the defendant and his innocent family. The level of
fear that the defendant and his innocent family members have been
suffering during the last six years is simply inconceivable to the
extent that the defendant and his family members are living at the
edge of the paroxysm, having emptied the last reserves of their sav-
ings while running for their lives.

CONCLUSION

For these reasons and plenty meritorious more, your movant asks this court to grant this motion, this way at least the defendant and his innocent family members could have peace of mind until the proceedings conclude. In order to avoid any possible ambiguity or misunderstanding, the defendant clearly states that in the event that this motion is denied, he still urges this court to file present motion, even knowing that the level of existing danger will be multiplied due to these taken actions, movant will voluntarily take the risk, asking God that movant and family members preserve their lives until this terrible and unjust course of actions committed by the U.S. government is rectified.

Respectfully submitted,

Luis Fernando Bertulucci Castillo
Reg. No. 95355-004
R I V E R S   C. I.
Post Office Box 630
Winton, N.C.  27986

OCT-31-2017
Date

## CERTIFICATE OF SERVICE

I, Luis Fernando Betulucci Castillo hereby certify that this 31th day of October, 2017, I placed a true and correct copy of this Motion in the legal mail box at Rivers Correctional Institution Post Office Box 630, Winton, N.C. 27986 with First Class postage affixed and addresed to the following parties:

Clerk of the Court
United States District Court
Southern District Of Florida
400 N. Miami Ave. Room 8N09
Miami, Florida 33128-7716

Lynn M. Kirkpatrick
AUSA U.S. Attorney's Office
99 N.E.  Street,
Miami, Florida 33132

Sheryl J. Lowenthal
Attorney at Law
221 East Government Street
Pensacola, Florida 32502

I declare, under penalty of perjury (Title 28 U.S.C. 1746) that the foregoing is true and correct.

Dated this 31th day of October, 2017

Luis Fernando Bertulucci Castillo
R I V E R S    C. I.
Reg. No.  95355-004
Post Office Box 630
Winton, N.C.  27986

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:11-CR-20321-PAS-1

UNITED STATES OF AMERICA,
        Plaintiff

            v.

LUIS FERNANDO BERTULUCCI CASTILLO,
        Defendant

MOTION FOR SPECIFIC PERFORMANCE OF
PLEA AGREEMENT AND MEMORANDUM OF
FACT AND LAW IN SUPPORT


Comes now the defendant Luis Fernando Bertulucci Castillo T/N Fernando Blengio Cesena (hereafter referred to as Mr. Blengio and/or the defendant) acting **pro se** and pursuant to 28 U.S.C. Section 2255, and moves the court for specific performance on his plea agreement and in support of this motion states:


BAD FAITH


On November 29, 2011, the United States entered into a plea agreement with the defendant which required him to "cooperate fully" and required the United States, obviously, to allow Mr. Blengio to cooperate and then to "evaluate" the nature and extent of that cooperation and to advise the court of said cooperation and decide whether to file a 5K1.1 and/or Rule 35(b) motion.

Subsequently, the government wrote in its untimely objection to Mr. Blengio's PSR that "Mr. Blengio negated the value of his own testimony and damaged the ability of the United States to prosecute certain cases in the future."

1

Similarly, the government's bad faith also extended to other portions of the plea agreement. The United States was required by the plea agreement, in response to Mr. Blengio's cooperation, to indicate whether said cooperation rose to the level of substantial assistance and, if it did, to move the court to lower Mr. Blengio's sentence due to such substantial assistance, either before sentencing through a 5k1.1 motion or after sentencing via a Rule 35(b) motion. While the government paid lip service to its obligation, it failed to meet any sort of burden of proof in its untimely objections, offering evidence and calling witnesses to address the court in order to support said objections in which the government's counsel alleged that Mr. Blengio's actions in providing assistance somehow led to obstruction of justice. Then the government, in a blatant show of bad faith, recommended at sentencing that Mr. Blengio "should get the top of the Guideline range for the drug offense, and that he should get the five years consecutive for the airplane registry." [DE-81 at 28 Lns. 7-9]

## INTRODUCTION

On May 6, 2011, the defendant was indicted and charged in Count 1 with conspiring to manufacture and distribute a controlled substance knowing that the controlled substance would be imported into the United States; in Count 2 with conspiracy to possess with intent to distribute cocaine while on board a United States registered aircraft; and in Count 3 with obtaining an owner's certificate of registration by falsifying and concealing the true owner of the aircraft.

On November 29. 2011, the defendant signed a plea agreement with the United States and entered his guilty plea consistent therewith. Mr. Blengio was the first defendant to enter into a plea agreement in the

instant conspiracy case.

The plea agreement provided, among other things, that the government would recommend that the defendant be sentenced at the low end of the Guidelines range, and that the government would "evaluate" the nature and extent of the defendant's cooperation and make the extent of that cooperation known to the court at the time of his sentencing. The government would also decide whether to file a 5K1.1 motion prior to sentencing and/or a Rule 35(b) motion following sentencing.

Mr. Blengio fulfilled his end of the agreement with the government. The agreement required Mr. Blengio to "cooperate fully" with the government's attorneys and agents. Mr. Blengio did so, providing both accurate and truthful information about others involved both in the conspiracy offense in which Mr. Blengio himself was involved, as well as about other violent crimes, including outrageous offenses which Mr. Blengio learned of while incarcerated at FDC Miami.

## BRIEF OF MR. BLENGIO'S "ACTUAL COOPERATION"

1. On July 7 through 9, 2011, DEA Agents Galloway and Highsmith interviewed Mr. Blengio several times concerning narcotics trafficking activities. See Exhibits 209 through 222. (DEA Forms - 6 Report of Investigation).

2. On July 25, 2011, Mr. Blengio met AUSA Hoffman and was debriefed by Agent Highsmith and others whose names Mr. Blengio never learned. See Exhibits 6 through 12 (Mr. Dominguez's Debriefing Notes); see also Exhibits 223 through 231 (DEA Forms - 6).

3. On August 1, 2011, Mr. Blengio met with DEA Agents Galloway and Highsmith. Also present was Tatiana Cortez, who Mr. Blengio had never met before. See Exhibits 13 and 14 (Mr. Dominguez's Notes).

3

4. On August 3, 2011, Mr. Blengio met with agents from different agencies. Among those present were DEA Agents Galloway and Highsmith. See Exhibits 232 through 234 (DEA Forms - 6). Mr. Dominguez was not present.

5. On August 10, 2011, Mr. Blengio met with agents from several agencies, including DEA Agents Galloway and Highsmith. See Exhibits 235 through 241. (DEA Forms - 6).

6. Throughout the rest of August and September 2011, there were various debriefings that Mr. Blengio's counsel Mr. Dominguez did not attend. One of those meetings was a very important one in which Mr. Blengio was debriefed by DEA Agent Thomas Bertuziak. Mr. Dominguez said that it was not necessary for him to attend these sessions since the defendant's relationship with the government was excellent. He assured the defendant that there was nothing to worry about.

7. On September 13, 2011, Mr. Blengio met with different agents, including DEA Agent Highsmith. See Exhibits 242 through 247. (DEA Forms - 6).

8. On October 12, 2011, Mr. Blengio met with AUSA Hoffman and DEA Agents Chris Lane, Paul Leyman, and Sara Harriet. See Exhibit 17 (Mr. Dominguez's notes).

9. On October 27, 2011, Mr. Blengio met with various DEA agents, including Agent Highsmith. See Exhibits 248 through 250. (DEA Forms - 6).

10. On November 8, 2011, Mr. Blengio met with various DEA agents, including Agent Highsmith. See Exhibits 251 through 256. (DEA Forms - 6).

11. On November 21, 2011, Mr. Blengio met with a group of AUSA's and agents from Chicago in an extensive meeting (lasting from 10:00

a.m. to 3:00 p.m.) in regards to Vicente Zambada Niebca, prosecuted in Chicago, Case No. 1:09-CR-0083 in front of Judge Ruben Castillo. Mr. Zambada signed a secret plea agreement on April 3, 2013. See Exhibits 20 and 21.

12. On December 7, 2011, Mr. Blengio was debriefed by AUSA Richard Gregory and DEA Agents Laurence Alexander and Thomas Highsmith. It was then before any conversation at the beginning of the interview that Mr. Blengio emphatically stressed to AUSA Gregory that there was an information leak somewhere as was evident by the meeting that occurred on November 21, 2011, between Mr. Blengio and Jorge Ivan Gonzalez A/K/A "J Firma" during which J Firma tried to purchase from Mr. Blengio information related to Vicente Zambada's case. See Exhibits 30 and 31 (Mr. Dominguez's Debriefing Notes).

13. On December 7, 2011, Mr. Blengio further told AUSA Gregory that not only had Mr. Blengio been approached by persons wanting to buy information from him but also that the situation in general was putting Mr. Blengio in danger and that he feared for his family's safety as well. Mr. Blengio told AUSA Gregory the names of the people at the November 21 surprise visit settled by Jorge Ivan Gonzalez A/K/A "J Firma" in which Korina Bolivar A/K/A "La Dama de Hierro" and Lina Sierra were present. Also discussed  was Beto Marin in detail after which Mr. Blengio handed to AUSA Gregory copies of: See Exhibits 27 through 29, as well as Exhibits "N" and "O" DE-14 1:15-CV-24396-FAM.

14. On December 7, 2011, in addition to Mr. Blengio's discussions about Beto Marin, Mr. Blengio provided AUSA Gregory with documents that were part of Marin's case that were delivered to him (Beto Marin) by his defense lawyer David Fernandez. These documents were handed to Mr. Blengio by Beto Marin in person at the FDC Miami visitors room

on one of the occasions that Marin approached Mr. Blengio about trying to buy information. See Exhibits 32 and 33.

15. On December 7, 2011, Mr. Blengio also delivered to AUSA Gregory documents in connection to his transactions with Venezuelan government officials, including a handwritten letter drafted by the Venezuelan minister Ali Rodriguez Araque; passport driving license and identification card copies of high-level National Guard official Vassily Villarroel Kotosky A/K/A "El Porto"; and a copy of an email dated May 27, 2006 written by Mr. Blengio while he was isolated after being kidnapped by Luis Frank Tello Camdelo A/K/A "El Negro Frank" and Angel Villarroel A/K/A "Kotosky". See Exhibits 34 through 40.

16. On December 12, 2011, Mr. Blengio was debriefed by E.D.N.Y. DEA Agent Walter Norkin in regards to Kotosky and El Negro Frank. See Exhibit 41 (Mr. Dominguez's notes).

17. On January 9, 2012, Mr. Blengio met with agents from different agencies. Again, DEA Agent Highsmith was present. As a matter of fact, during a July 25 debriefing when Mr. Blengio mentioned that he and his family were kidnapped by El Negro Frank and Kotosky, Agent Highsmith forbade Mr. Blengio from mentioning the event in the future because El Negro Frank was an important cooperating witness. See Exhibit 12, and also Exhibits 257 through 259 (DEA Forms - 6). In multiple interviews, Mr. Blengio was debriefed by agents from different agencies, such as FBI, ICE, and others. But the U.S. government has withheld all of the notes and reports of these interviews. During the rest of January and into February and March, there were more debriefings that Mr. Blengio cannot reference due to the same aforementioned reason: that the AUSA's office has been withholding all of these records. See DE-119, DE-120, DE-122, DE-123, DE-124, and DE-126.

6

By fulfilling his end of the cooperation deal with the U.S. government, Mr. Blengio not only put his own life in danger but also exposed his innocent family to great personal danger in spite of his significant and extensive efforts and cooperation, while the U.S. government was signing the plea agreement with Mr. Blengio the government requested to seal at that point Mr. Blengio's case because the defendant (as explicitly the government's own words indicate) "was not identified anywhere in the record by his true name identity ... for his own safety and the fact that there are family members within the country of Mexico" and further that "Chicago needs time to make decisions and methodologies for whether there are going to remove his family out of Mexico." DE-44 at 35 and 36.

While the agreement "reserves" to the government its right to evaluate Mr. Blengio's cooperation and allows the government the final word on whether to file any 5K1.1 or Rule 35(b) motion, **the government is required to exercise good faith.** As set forth herein, the government has acted in bad faith, not only in both failing to recommend that the defendant be sentenced to the low end of the Guidelines range and failing to consider and evaluate Mr. Blengio's substantial cooperation and assistance, but also failing to fulfill its specific part of the contract to recommend at sentencing that the court reduce by three levels the sentencing guideline applicable to the defendant's offense pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility for his crimes.

The events leading up to sentencing, as well as the conduct of the government counsel at Mr. Blengio's sentencing hearing, demonstrate that Mr. Blengio is entitled to specific enforcement of his

plea agreement with the United States government. In summary, those
events are as follows:

> July 3, 2011 - Not guilty plea entered.
>
> November 29, 2011 - Change of plea hearing in which
> Mr. Blengio pled guilty.
>
> January 4, 2012 - Mr. Blengio's PSR was distributed
> to all parties.
>
> January 14, 2012 - A statement of acceptance of re-
> sponsibility was included in a revised PSR.
>
> February 1, 2012 - Probation Office revised Mr. Blengio's
> PSR again to reflect defendant's acceptance of responsi-
> bility, including a three level Guidelines range reduc-
> tion per 3E1.1.
>
> No objections to the revised PSR were filed either by
> the government or the defendant.
>
> December 14, 2012 - Mr. Blengio's sentencing hearing
> occurred.

The transcript of the sentencing hearing shows that the govern-
ment not only did not recommend a sentence at the lower end of the
Guidelines range as the plea agreement required it to but also paid
mere lip service to its recommendation while arguing that Mr. Blengio
had also obstructed justice and urging the court to impose the "top of
the Guideline range for drug offense."

Government counsel responded vexedly when Mr. Blengio filed a
motion requesting to withdraw his guilty plea, even going so far as to
allege that the objections toward Mr. Blengio's PSR somehow released
the government from its obligations under the plea agreement.

Despite the fact that the defendant's attempt to withdraw his
guilty plea was struck by this court and that the response to the gov-
ernment's objections filed by the defendant was overlooked, disregarded
and never ruled on (DE-40), the government still alleged that Mr.
Blengio tried to sell information without any proof at all: no evi-

dence, no witnesses, and no testimony -- only the government's own
bald assertions about defendant's alleged actions (DE-39).

After the government's acknowledgment and concern of the extreme
danger posed to Mr. Blengio's family by the assistance he provided to
government investigators, the AUSA then further retaliated against Mr.
Blengio by moving to unseal the records which revealed Mr. Blengio's
cooperation. This action caused entirely innocent members of Mr.
Blengio's family to have to flee their homes in fear of their lives
and essentially go into hiding in their own country (of Mexico). This,
notwithstanding that the government had promised to assist them in
removal from Mexico to a more secure location in the United States
during a meeting that Mr. Blengio's family attended at the United
States Embassy in Mexico City with government officials.

Then the government capriciously and arbitrarily refused to re-
commend a 5K1.1 downward departure for Mr. Blengio, despite his
having been promised such a motion, which he duly earned through the
valuable assistance he provided government investigators in securing
the conviction of prominent drug offenders. In fact, a number of gov-
ernment agents and members of the U.S. Attorney's Office had warmly
welcomed and praised Mr. Blengio for his degree of cooperation.

The U.S. government extracted large amounts of substantial and
sensitive information from the defendant and used it to assist in a
a number of crucial investigations, arrests, seizures of aircraft, and
prosecutions. The government unsealed previously sealed court records,
leaving Mr. Blengio to "twist in the wind," placing both him and his
innocent family members, including children, at great risk of injury,
kidnapping, and/or death.

The government's insidious allegations were accepted without a

court order forcing the prosecutor to prove the identity of the individuals referred to in the government's objections to Mr. Blengio's PSR. The government never turned over any report or interviews (or any other evidence) from or relating to the individuals referred to in the government's objections, despite that doing so was required in the response by Mr. Blengio (which was never ruled on or resolved) to the government's untimely objections. The government's violation of the defendant's plea agreement and the conduct of the government's counsel smacks of vindictiveness.

The government similarly violated the plea agreement by failing to act in good faith regarding the defendant's cooperation. Frankly, the only conclusion that may be drawn from the history of this case is that even though the government never corroborated its allegations of Mr. Blengio's misconduct, it also never intended in good faith to evaluate the defendant's cooperation and assistance.

At one point in the extended cooperation, dialogues, debriefings, and interviews with Mr. Blengio (across multiple districts, AUSA's, and agents), the AUSA's Shakeshaft and Ferrara from Chicago asked Mr. Blengio to provide some records and materials regarding some of the transactions involved highly ranked international drug traffickers. Mr. Blengio arranged for boxes full of documents to be provided in response to the government's request, but the government subsequently stopped communications with the defendant without explanation. This epitomizes the government's wrongheaded "disinterest" in Mr. Blengio's cooperation and assistance.

Substantial information corroborated by documents and other witnesses was provided to the government either directly by Mr. Blengio or from his former counsel Humberto Dominguez.

Mr. Blengio cooperated fully with lawyers from the Department of Justice and was ready to testify in an important trial out of Chicago prosecution, and also was willing to provide more assistance to different offices of the U.S. Attorneys. The record of proffers and efforts to provide additional assistance by Mr. Blengio are set forth in detail in the "Proffer of Facts to Be Proven at Hearing," which is filed with this motion but under seal.

The responses -- and, quite frankly, more often the lack of any response -- from the government very strongly support only one conclusion: the government had decided that under no circumstance would it consider filing a 5K1.1 and/or 35(b) motion despite having agreed to consider doing so in the defendant's plea agreement. According to due process the only way to guarantee the defendant's constitutional rights would be through an evidentiary hearing. To do otherwise would be to perpetuate a gross injustice beneath the values of the United States of America.

IN DETERMINING THE EXTENT OF U.S. SEN-
TENCING GUIDELINES MANUAL 5K1.1 DEPAR-
TURE A DISTRICT COURT MUST CONSIDER THE
FIVE NON-EXCLUSIVE 5K1.1 FACTORS, WHICH
ARE:

1. The usefulness of the defendant's assistance:
"Mr. Blengio's cooperation proceed productively." (AUSA's words, DE-39 at 2)

2. The truthfulness and completeness of the defendant's information and testimony:
"They are all being interviewed incessantly, and the cooperation is phenomenally easier if they are not sentenced." (AUSA's own words, DE-45 at 7)

11

3. The nature and extent of the defendant's assistance:
"Moreover, his cooperation was in depth and covered a significant range
of drug trafficking activities both of his own and others." (AUSA's own
words, DE-39 at 2; Lns. 2-3)

4. Any injury suffered or risk of injury or danger of the defen-
dant and his family as a result of his assistance:
The government requested to seal Mr. Blengio's case because "[t]hey
did not know -- again since this is going to be sealed -- that he had
face-to-face dealings with their defendant until a week ago. So they
need to step through some hoops in Chicago, and then they need to worry
about how to get four people out of Mexico safely." (AUSA's own words,
DE-45 at 36)

5. The timeliness of the assistance:
"He was very forthcoming even on the day of his arrest so quite frankly
he has been cooperating from the moment to go." (AUSA's own words,
DE-44 at 15, Lns. 20-22)

   [5K1.1 factors taken from U.S. Sentencing Guidelines Manual,
   5K1.1(a)(1)-(5).]

The district court may consider factors beyond those five, but
only if the factors relate to assistance provided by the defendant.

Mr. Blengio was engaged in an undercover activity setting up a
narcotics smuggling operation from the prison where he was incarcerated.
See Exhibits 251 through 253 (DEA Forms - 6, Report of Investigation).
By unsealing Mr. Blengio's cooperation agreement and records in its
entirety, the U.S. government has harmed Mr. Blengio and his innocent
family beyond measure.

## MEMORANDUM OF AUTHORITIES

This court has jurisdiction over a motion to enforce a plea agreement. United States v. Al-Arian, 514 F.3d 1184 (11th Cir. 2008). A motion pursuant to 28 U.S.C. Section 2255 may be used to enforce a plea agreement as well.

In Santobello v. New York, 404 U.S. 257, 82 S.Ct. 495 30 L.Ed. 427 (1971) the Supreme Court held that "when a plea rests in any significant degree on a promise . . . of the prosecutor, so that it can be said to be in part of the inducement or consideration, such promise must be fulfilled." 404 at 262 S. Ct.

Due process requires that the government adhere to the promises made in a plea agreement. United States v. Harvey, 869 F.2d 1439, 1443 (11th Cir. 1989) en blanc.

In **Santobello**, the defendant entered a guilty plea in reliance on the prosecutor's promise not to make a sentencing recommendation. **Santobello**, 404 U.S. 259, 92 S. Ct. at 497. The court sentenced the defendant to one year in prison. The Supreme Court concluded that in the event that the government does not honor its end of the bargain that included a guilty plea by the defendant, the court that sentenced the defendant has discretion to fashion an appropriate remedy, such as whether to order specific performance of the plea agreement or to allow the defendant to withdraw his guilty plea. 404 U.S. at 262-63, 92 S. Ct. at 499. Therefore, in **Santobello**, the Supreme Court implicitly recognized that the court that accepts a guilty plea has jurisdiction to enforce a plea agreement if the government is in breach.

Following **Santobello**, the Eleventh Circuit addressed the issue in In Re: **Arnett**, 804 F.2d 1200 "wherein the government has not honored

13

a plea agreement, the hardship of an appropriate remedy is left to the sound discretion of the court." 804 F.2d at 1204. The Eleventh Circuit further wrote: "This circuit court follows the principles enunciated in **Santobello** by requesting the government to adhere strictly to the terms of plea agreement."

## OTHER AUTHORITIES

Comes now, Luis Fernando Bertulucci Castillo, appearing personally pursuant to the Judiciary Act of 1789, Section 35, and hereby files his motion for specific performance of plea agreement and memorandum of fact and law in support, which also includes matters of great interest regarding defendant's claims of the government's bad faith, vindictiveness in prosecution, prosecutorial misconduct, and abuse of discretion; all of this in violation of defendant's Fifth, Sixth, and Fourteenth Amendment rights to due process. These issues can certainly be entertained by this court in order to provide the desired relief sought by the defendant.

The Judiciary Act of 1789, Section 32, states: "And it be further enacted, that no summons, writ, declaration, return, process, judgment, or other proceedings in civil cases in any of the courts of the United States shall be abated, arrested, quashed, or otherwise reversed for any defect or want of form. But said courts shall proceed and give judgment according as the right of cause and matter of law shall appear unto them without regarding imperfections, or want for of such writ, declaration or their pleadings, return, process, or court proceedings whatsoever." The Judiciary Act of 1789 has never been amended or repealed.

## THE GOVERNMENT MUST ACT IN GOOD FAITH WHEN IT NEGOTIATES A PLEA AGREEMENT CONTEMPLATING COOPERATION AND POSSIBLE 5K1.1 OR RULE 35 MOTIONS

The agreement here contemplated that Mr. Blengio would cooperate "fully" with the government and that the government would evaluate the cooperation and make a decision regarding the filing of a 5K1.1 motion and/or a Rule 35(b) motion. It is evident from the record in this case: the substantial assistance provided to the government from the defendant, and the substantial assistance proffer, as well, which is filed under seal with this motion. But it is also evident that the government had decided to not fulfill its end of the bargain as was contemplated by the plea agreement.

The United States and Mr. Blengio entered into a contract. It is apparent from the history of the case that the United States entered into the agreement under restraint conditions that it will make hard to honestly evaluate Mr. Blengio's cooperation and certainly much more difficult to file a 5K1.1 and/or Rule 35(b) motion in defendant's case. Especially after the extremely bizarre circumstances that surrounded Mr. Blengio's arrest in the Dominican Republic. First and foremost, there was no arrest warrant, nor search warrant, and certainly no Miranda rights were ever read or given to the defendant. This somewhat questionable and suspect situation provoked a series of events in which Mr. Blengio ended up giving up all of his and his wife's assets in the face of a threat from the government not to dispute any of these matters (the warrants, Miranda rights, assets, and belongings), all as preconditions to keep the cooperation door open when the door had, in fact, never been open.

In the August 6, 2012, sentencing hearing, Judge Seitz stated:

"Giving the asset of a plane worth 140 to $160,000 -- " Then the pro-
secutor interrupted the judge, saying: "It is not in his custody or
control, Your Honor, his assets were all left in the Dominican Re-
public, and to my knowledge they were taken by the Dominican author-
ities." DE-47 at 32, Lns. 18-22.

Federal district courts have the authority to review the govern-
ment's refusal to file a substantial assistance motion. United States
v. Wade, 112 S. Ct. 1840 (1992). The court concluded that "Wade would
be entitled to relief if his prosecutor's refusal was not rationally
related to any legitimate government end."

More recently, the Eleventh Circuit made it clear that relief
can be granted either where the government acted with an unconstitu-
tional motive or when the government breaches the parties' plea
agreement. United States v. Gilmore, 149 Fed. Appx. 883 (11th 2005).
The Gilmore court concluded that "Gilmore has not shown that the
government failed to consider his cooperation -- the only thing pro-
mised to him in the plea agreement" and rejected Gilmore's claims.
However, Mr. Blengio asserts and believes that an evidentiary hear-
ing will allow him to show that the United States has wholly failed
to consider or evaluate his cooperation under any objective, rational,
or reasonable standard because the government, contrary to the agree-
ment, never considered allowing Mr. Blengio to obtain any sentence
as it had agreed to recommend. This can be further inferred by the
government's already having breached the agreement in not recommending
at the low end of the Guidelines range.

At every opportunity, the government rejected, ignored, or re-
fused to consider Mr. Blengio's proffers and willingness to cooperate.
But not only that, the prosecutor also rejected several requests from

other government officials who were seeking Mr. Blengio's assistance in important investigations. Case in point: DEA Special Agent Michael Silveira contacted AUSA Hoffman because his office (a Boston district) believed that Mr. Blengio might have information that could be of great assistance for their investigations. After consulting with AUSA Hoffman, Special Agent Silveira wrote "AUSA Hoffman is not interested in working in and assisting Mr. Blengio in which case we must respect AUSA Hoffman's decision and follow suit." See "Proffer of Facts to Be Filed at Hearing" filed with this motion but under seal. The aforesaid documents make clear that the government violated its end of the plea agreement. Specific enforcement is the remedy sought.

Mr. Blengio, who has and continues to fully accept responsibility for his conduct, is not asking to withdraw his plea. Mr. Blengio seeks judicial enforcement of the plea agreement. The government has resisted Mr. Blengio's offers to cooperate, has failed to consider any cooperating by refusing not only Special Agent Silveira's request but also those from at least another three different districts, and is as the prosecutor stated, "uninterested in overtures for cooperation from Mr. Blengio."

The case most similar to the present case is United States v. Ganz, 806 F.Supp 1567 (S.D.FL Sept. 14, 1991) in which the late District Court Judge Shelby Highsmith granted a similar motion for specific enforcement of a plea agreement. Judge Highsmith rejected the government's position that as long as it does not discriminate on the basis of race or religion, it can act in bad faith. The **Ganz** plea agreement language, like here, reserved to the government the right to consider and evaluate the defendant's cooperation and to make the decision whether to file a 5K1.1 or Rule 35(b) motion. The "Reser-

vation of right" contained in this case is identical to that in **Ganz**.

Judge Highsmith interpreted against the government any ambiguity contained in the government's "reservation of right" to make a 5K1.1 motion. The court observed that the government may not act in bad faith when refusing to carry out a discretionary term in a plea agreement. See United States v. Rexach, 896 F.2d 710, 714 (2nd Cir), cert denied 498 U.S. 969, 111 S. Ct. 433 (1990) in which a prosecutor's discretion is "not completely unlimited," he may not make decisions "individiously or in bad faith." Also see United States v. Kahn, 920, F.2d 1100, 1105 (2nd Cir. 1990) cert denied, 499 U.S. 989 (1991) "where the explicit terms of a cooperation agreement leave the acceptance of the defendant's performance to the sole discretion of the prosecutor, that discretion is limited by the requirement that it be exercised fairly and in good faith." Also: United States v. Kuntz, 908 F.2d 655, 657 (10th Cir. 1990) where "we do not preclude the possibility that perhaps in an egregious case -- a case where the prosecutor stubbornly refuses to file a motion despite overwhelming evidence that the accused's assistance has been so substantial as to cry out for meaningful relief -- the court would be justified in taking some corrective action." Also: United States v. Vargas, 925 F.2d 1260, 1266 (10th Cir. 1991) "when a plea agreement leaves discretion to the prosecutor, the court's role is limited to deciding whether the prosecution has made its determination in good faith."

> There are two steps in sentencing where a cooperation agreement contemplates a motion for downward departure. Defendant must first allege that he or she believes the government is acting in bad faith. Such an allegation is necessary to require the prosecutor to explain briefly the government's reasons for refusing to make a downward departure motion. In as much as a defendant will generally have no knowledge of the prosecutor's reasons, at

> this first or pleading step the defendant should
> leave no burden to make any showing or prosecu-
> torial bad faith. Following the government's ex-
> planation the second step imposes on defendant the
> requirement of making a showing of bad faith suf-
> ficient to trigger some form of hearing on that
> issue. Khan, 920 F.2d at 1106.

Judge Highsmith granted **Ganz's** motion for specific enforcement and ordered the government to file a 5K1.1 motion based on Ganz having provided all of the information the government sought and upon Ganz's reliance on the agreement, both in entering his guilty plea and in forfeiting property to which there may have been an innocent owner defense.

Mr. Blengio's case is even more compelling. The government's bad faith in **swindling Mr. Blengio through empty promises** and extracting a wall full of boxes of sensitive information from him, encouraging him to set up a narcotics smuggling operation **while incarcerated**, co-ercing him into giving up all of his assets, and on stop of that re-fusing and resisting his cooperation and assistance, **all of this in bad faith**, that was compounded by the vindictive actions of the govern-ment regarding Mr. Blengio's contractual right to a downward depar-ture and contractual right to have the government sincerely recommend a 5K1.1 motion. The government has a good faith obligation to fulfill **all** of its obligations in a plea agreement. United States v. Rewis, 969 F.2d 985, 988 (11th Cir. 1932) quoting Santobello v. New York, 404 U.S. at 257, 262 (1981): "Whether the government violated the agree-ment is judged according to the defendant's reasonable understanding at the time he entered the plea."

Mr. Blengio's understanding was fairly simpple and straight forward: the quid pro quo for Mr. Blengio's guilty plea and giving up all his assets was obtaining a considerable sentencing reduction from

the government with the right to work toward obtaining a 5K1.1 and/or
Rule 35(b) motion. The government acted in **sheer bad faith**, deceiving
him into disclosing substantial information relevant to criminal invest-
igations and then later rebuffing his efforts to cooperate further. In
doing so, the government not only slammed shut the cooperation door
but also essentially forced him to abandon his assets in the Dominican
Republic and threatened him with a 100 year sentence if he decided to
go to trial. The government then further vindictively and capriciously
filed objections to Mr. Blengio's PSR without any proof (or even evi-
dence of any sort) and no witnesses or testimony other than the bald
assertions of the prosecutor -- even after Mr. Blengio had succumbed to
the government's intimidation, extortion, and threats by relinquishing
his right to raise any complaints regarding his abandoned assets in the
Dominican Republic. Just as in **Ganz**, the government's bad faith was
exacerbated by its obtaining not just Mr. Blengio's forsaken assets but
also those of his wife and son, including her cash and jewelry and his
son's airplane, and then failing to fulfill its end of the deal.

The defendant urges this court to give careful consideration to
Judge Highsmith's well-reasoned and well-written opinion in **Ganz**, in-
cluding his ruling after the government sought to reopen the record
for reconsideration, which included:

> As the trustee of the people, the government is held
> to a higher standard in carrying our common duties,
> including the prosecution of crimes. This higher
> standard requires the sovereign to perform its con-
> tractual duties with a sharpened sense of good faith
> and fair dealing. The fact that the other party to
> the contract is a criminal defendant does not alter
> the government's duty.

Judge Highsmith concluded:

> In this case the government used its 5K1.1 discre-
> tion as a bargaining chip in the plea negotiation

process. The contract between the parties re-
quired Mr. Ganz to provide information, truthful
testimony and to work under discretion of customs
in an undercover capacity. Mr. Ganz went above and
beyond the agreement, even at great risk to him-
self and his family. Mr. Ganz went beyond the
written "quid pro quo." He persuaded his wife to
dismiss her innocent spouse claim in the pending
civil forfeiture case concerning their marital house.
This court has presided over sentencing hearings
during which the United States has moved for a down-
ward depature based on substantial assistance where
defendants have done far less for the government
involving substantially identical agreements. The
government's conduct and bad faith in its dealings
with the defendant in this case shocks the con-
science of the court. [Order at 1570]

Just as in **Ganz**, the United States **should** be ordered by this
court to fulfill its agreement with Mr. Blengio.

### MERE LIP SERVICE GIVEN TO A SENTENCING RECOMMENDATION THAT IS PART OF A PLEA AGREEMENT IS INSUFFICIENT TO FULFILL THE GOVERNMENT'S CONTRACTUAL PROMISE

In this case the government clearly advanced reasons for senten-

cing the defendant to more than the low end of the Guidelines range

to which the parties had agreed. "The government's comments at sen-

tencing may break the promises contained in a plea agreement when the

prosecutor's words do not explicitly call for the forbidden result."

United States v. Taylor, 77 F.3d 368, 370 (11th Cir. 1996). "Merely

paying lip service to a plea agreement does not satisfy the govern-

ment obligation under a plea agreement to make a particular senten-

cing recommendation." United States v. Lynn, 385 Fe. Appx. 962 (11th

Cir. 2010). The government did not ask for the agreed upon low end of

the Guidelines. Rather, it put forth such strenuous objections and

proffered matters clearly directed toward obtaining the longest pos-

sible sentence for Mr. Blengio, as opposed to the agreed upon low end

21

of the Guidelines range.

In another case that is strikingly similar to the present one, the Eleventh Circuit reversed a sentence of 63 months in United States v. Haber, 299 Fed. Appx. 865 (11th Cir. 2008). The government agreed, as here in Mr. Blengio's case, to recommend the low end of the Guidelines range, which in Haber's case was 51-63 months. At Haber's sentencing hearing, the government presented two witnesses who testified that Haber engaged in misconduct after signing his plea agreement. When the court asked the parties to present matters regarding an appropriate sentence, the government stated:

> Judge, I've been doing this for 15 years and I pride myself on having impeccable judgment... I don't think... If I knew a year ago what I know today, that I would have agreed to this plea and I would have handled this case in the same way. I have been extremely generous to Mr. Haber in structuring this case... I did not include a forfeiture count, which I should have, I didn't include tax charges, which I should have, I didn't include a money laundering count, which I should have. And today's Guideline range of 51 to 63 months is the spirit of the plea agreement for sure, but it woefully underrepresents Mr. Haber's conduct in this case. I essentially allowed him to remain out on bond, where he continued to commit all sorts of financial shenanigans, to get his affairs in order, to make himself judgment proof, to make sure that his family was taken care of, and pay back those victims that he thought might cause a ruckus or show up and testify against him... I think this Guideline range, while it lives up to the spirit of the plea agreement, I think it's a gift from God that essentially 15 years of ripping off the public he is looking at 51 to 63 months. We plan to live up to our plea agreement because if we don't do that, then our word means nothing essentially, but we leave it in the discretion of the court to fashion an appropriate sentence.

The presentations, arguments, and allegations advanced by the AUSA in the instant case are no less troubling than the government's comments in **Haber**. Mr. Blengio's case may be even more compelling be-

cause the government never called, much less presented, witnesses in any sort of effort to proove (or even offer a bare minimum of substantiation) its allegations of Mr. Blengio's misconduct. The government's string of abuses against Mr. Blengio were multiple and diverse, such as this which occurred during his sentencing hearing when Judge Moreno asked the length of the sentences of some of Mr. Blengio's co-defendants: "What did the Suarez father and son get as sentences?: The prosecutor, deceiving Judge Moreno, responded: "292 months for the father, Your Honor. The son was able to have completed cooperation on a discrete matter. He was facing 262 and he received -- I'm sorry, off the top of my head, Your Honor, it was a high 100's, but I don't recall the exact number. But the father got 292 months, Your Honor." DE-76 at 27, Lns. 7-14. In fact, the Suarez father received 235 months. CM/ECF-Line Database - FLSP source. The son received not even 90 months. Besides that, the prosecutor also knew that both of them would be receiving a preconditioned Rule 35 adjustment. The Suarez father will be released on May 9, 2020, and his son on May 3, 2018. FBOP Inmate Locator source. In the Eleventh Circuit, a sentence can only be modified via Rule 35 of the FRCP or as expressly provided by 28 U.S.C. § 2255. United States v. Celedon, 353 Fed. Appx. 272, 280 (11th Cir. 2009) citing United States v. Diaz-Clark, 292 F.3d 1310, 1316-1318 (11th Cir. 2002). "Therefore the defendant's claims for a modification of his sentence due to his substantial assistance and the alleged unwarranted disparity compared to the sentence of some of his co-defendants must establish a cognizable claim under Rule 35 or 28 U.S.C. § 2255 in order for his sentence to be modified."

It is clear from the record that the prosecutor's vindictive feelings came through at Mr. Blengio's sentencing, and that as a result

of such government bias and misconduct the lives of a well-intentioned cooperating witness and his family were placed at risk of grave danger by the unsealing of Mr. Blengio's court records. The government got everything it wanted and needed from Mr. Blengio and then callously terminated his cooperation based upon vague allegations of misconduct that Mr. Blengio was never given the opportunity to refute. Neither Judge Seitz nor Judge Moreno afforded Mr. Blengio due process by conducting an evidentiary hearing to flesh out the government's unsupported and uncorroborated allegations, and to allow Mr. Blengio to defend and vindicate himself. The record shows that Judge Seitz expressed concern about the length of time that had elapsed following the entry of Mr. Blengio's guilty plea, and he had yet to be sentenced. The record also shows that it was the prosecutor who requested and was granted several continuances of the sentencing hearing for the benefit and convenience of the government. Sentencing continuances were granted at the behest of the government because: "The cooperation is phenomenally easier if they are not yet sentenced, Your Honor, for the government in every form and fashion." (Government's own words, DE-45 at 7, Lns. 1-6).

When requesting a continuance of a sentencing hearing, the prosecutor praised Mr. Blengio's cooperation, his substantial assistance, the excellence of the information he provided, and the importance of the subjects of the information. The prosecutor assured Judge Seitz that Mr. Blengio's cooperation was "perfect" (prosecutor's own words) and that his entitlement to a substantial sentence reduction consistent with this perfect cooperation was a sure things. In fact, to use the prosecutor's own words: "He is entirely cooperative witness, has been from the first day he was arrested in the Dominican Republic, he will step forward to your charges. Your sentencing will be 12 sec-

onds long." DE-45 at 6, Lns. 8-10. That is how oustanding and sub-
stantial Mr. Blengio's cooperation had been and how certain the pro-
secutor was that Mr. Blengio would receive a signifcant, promised
sentence reduction. Mr. Blengio's cooperation has yielded extraor-
dinary results for the government in the investigations, arrests, and
prosecutions of -- in the government's own words -- "some of the most
dangerous drug traffickers in the world," as well as profitable sei-
zures of aircraft and other bounty. The AUSA here, like the prosecu-
tor in Haber, gave mere lip service to the promised sentence reduc-
tion and low Guidelines sentence recommendation. But in Mr. Blengio's
case, the AUSA went even farther than in Haber by making assertions
against the defendant without offering any evidence or presenting any
witnesses or testimony.


CONCLUSION

Thankfully, it is rare for the United States to enter into an
agreement that its prosecutors never intended to fulfull. However,
this case is just such a case. Despite entering into an agreement that
provided the defendant a three level reduction in his sentencing
Guidelines, a guarantee that the government would recommend a sentence
at the low end of the Guidelines, and which certainly contemplated and
indeed required the defendant to cooperate and obligated the govern-
ment to support a downward departure on the basis of that cooperation,
Mr. Blengio was sentenced to 162 months in prison after the govern-
ment obtained from him boxes full of very valuable information. In-
deed, the remarkable extent of Mr. Blengio's cooperation, and the
extreme danger that all of his family members were (and still are)

exposed to was additional consideration for the agreement to be en-
forced. The government entered into the plea agreement with Mr. Blengio
in bad faith, and continued to show bad faith throughout the sentenc-
ing process by vindictively presenting baseless accusations and then
failing to follow through on its obligation to recommend a low Guide-
lines sentence and to move the court for a further downward departure
due to his extraordinary level of cooperation.

Whether vindictive or not, the government violated its agreement
to recommend a downward departure and low Guidelines sentence. The
conduct of the government in this case clearly was inappropriate and
a show of bad faith, and should shock the conscience of any reasonable
jurist. In a case like this, weighed down with overwhelming and con-
clusive evidence in favor of the defendant, and allegations from a
vindictive prosecutor who offers absolutely no evidence for the claims
against the defendant, the requested evidentiary hearing will establish
Mr. Blengio's entitlement to relief. The government should be required
to fulfill its agreement in every respect and to do so in good faith.
An order enforcing the plea agreement should be entered by this
honorable court.


Respectfull submitted,


Luis Fernando Bertulucci Castillo
Reg. No. /95355-004
R I V E R S  C. I.
Post Office Box 630
Winton, N.C.  27986

OCT-31-2017
Date

## CERTIFICATE OF SERVICE

I, Luis Fernando Betulucci Castillo hereby certify that this 31th day of October, 2017, I placed a true and correct copy of this Motion in the legal mail box at Rivers Correctional Institution Post Office Box 630, Winton, N.C. 27986 with First Class postage affixed and addressed to the following parties:


Clerk of the Court
United States District Court
Southern District Of Florida
400 N. Miami Ave. Room 8N09
Miami, Florida 33128-7716

Lynn M. Kirkpatrick
AUSA U.S. Attorney's Office
99 N.E.  Street,
Miami, Florida 33132


Sheryl J. Lowenthal
Attorney at Law
221 East Government Street
Pensacola, Florida 32502


I declare, under penalty of perjury (Title 28 U.S.C. 1746) that the foregoing is true and correct.

Dated this 31th day of October, 2017


Luis Fernando Bertulucci Castillo
R I V E R S   C. I.
Reg. No.  95355-004
Post Office Box 630
Winton, N.C.  27986